UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    MHS MANAGEMENT GROUP, LLC          CASE NO. 08-63116


                       Debtors                    Chapter 11
--------------------------------------------------------
APPEARANCES:

PAUL A. LEVINE, ESQ.
*Attorney for Debtors*
50 Beaver Street
Albany, New York 12207

FRANCIS J. BRENNAN, ESQ.
*Attorney for Benjamin Irwin, LLC*
39 North Pearl Street
Albany, New York 12207

Hon. Diane Davis, U.S. Bankruptcy Judge

**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

The Court has under consideration a motion filed on January 28, 2009, on behalf of Benjamin Irwin, LLC ("BI"), seeking relief from the automatic stay pursuant to § 362(d)(1) and (2) of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1532 ("Code") in the case of MHS Management Group, LLC ("Debtor") to allow it to proceed with foreclosure on certain property located in Rome, New York. In the alternative, BI seeks the appointment of a § 1104 trustee and an Order directing the Debtor to make adequate protection payments to it. Opposition was filed on behalf of the Debtor on February 19, 2009.

The motion was heard at the Court's regular motion term in Utica, New York, on February 24, 2009. Following oral argument, the Court indicated that it would schedule the motion for an

evidentiary hearing. The Court indicated that although Code § 362(e) required a determination be made within 30 days of the request for relief from the automatic stay, it was exercising its option to extend said determination.[1] Although there was some discussion about Code § 362(d)(3), applicable to single asset real estate cases, BI's counsel did not assert that section of the Code in its motion under the belief that such relief was not available until 90 days after the commencement of the case.

An Evidentiary Hearing was conducted on August 10, 2009. In lieu of closing arguments, the parties were asked to file post-hearing memoranda of law by September 14, 2009. The matter was taken under submission on that date.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A), (G) and (O).

---

[1] On February 25, 2009, the Debtor filed a motion requesting that the Court grant an extension of the stay set forth at Code § 362(d)(3), which requires that the Debtor either file a plan of reorganization or commence monthly payments to BI within 90 days after the entry of the order for relief. On March 19, 2009, the United States Trustee ("UST") filed a letter indicating that the UST did not oppose the relief requested (Dkt. No. 43). In addition, on March 19, 2009, BI filed opposition to the Debtor's motion to which the Debtor filed a reply on March 23, 2009. The Court signed an Order granting the extension on March 31, 2009, following a hearing on March 24, 2009. The Court granted a further extension to June 24, 2009. On July 16, 2009, the Court signed an Order granting a further extension to August 10, 2009, and then to September 17, 2009. On September 17, 2009, the Court agreed to a further extension to November 12, 2009 on the consent of BI's counsel.

3

# FACTS

Based on stipulated facts submitted by the parties, as well as testimony and exhibits offered at the Evidentiary Hearing, the Court notes the following:

1. The Debtor is the owner of real property located on East Bloomfield Street, City of Rome, County of Oneida, New York (the "Property"), otherwise known as Maplewood Garden Apartments.

2. The Property consists of 17 buildings containing 167 residential apartment units.

3. Prior to October 2004, the Property was owned by the Neuman LLCs in which Phillip Neuman ("Neuman") was the sole or managing member.

4. In October 2004, the Neuman LLCs transferred the Property to the Debtor.

5. Between October 2004 and April 15, 2005, Matthew Solof ("Solof") was the sole member of the Debtor.

6. Between April 15, 2005 and July 10, 2007, Solof and Neuman each held a 50% interest in the Debtor (Exhibit H).

7. Prior to the transfer of the Property to the Debtor in October 2004, it was encumbered by mortgages held by Landco Mortgage Bankers, Inc.[2] in original principal amounts of $1 million and $500,000.00, and another mortgage held by Solof and Harry Bienenfeld in the original principal amount of $400,000.00.

8. On or about March 30, 2005, the Debtor refinanced the mortgages with M&T Real Estate Trust in the principal amount of $2,900,000.00, of which $2,500,000.00 was disbursed to Richard Newberg, as Attorney ($468,167.16); Harry Bienenfeld ($291,000.00); Landco Mortgage Bankers, Inc. ($1,044,255.03); Landco Mortgage Bankers, Inc. ($519,577.81) and Solof ($177,000.00) (Exhibits B and F).

9. BI holds a duly perfected, first mortgage interest in the Property pursuant to an Assignment of Mortgage executed by M&T Real Estate Trust on or about February 23, 2006 (Exhibit D).

---

[2] At the evidentiary hearing, Solof testified that at the time that a loan had been made to one of Neuman's entities and a mortgage granted on the Property, he owned Landco Mortgage Bankers, Inc. (Transcript ("Tr.") of the Evidentiary Hearing held on August 10, 2009 at 12).

4

10. BI commenced a foreclosure action against the Debtor on July 21, 2006 (Exhibit N), and a Judgment of Foreclosure and Sale was signed on March 21, 2007, and entered on April 3, 2007 (Exhibit L).

11. BI and the Debtor entered into a Stipulation of Forbearance, dated July 10, 2007, which was signed by Neuman "as the sole member of the Debtor" and by Peter T. Roach & Associates, P.C., attorney for BI (Exhibit J). The Stipulation of Forbearance indicates that there was due and owing to BI a principal balance of $2.9 million and arrears of $269,373.00 in connection with the mortgage.

12. Pursuant to an Estoppel Certificate, signed by Neuman, as "sole member of the Debtor" on July 10, 2007, he not only acknowledged the validity of the mortgage and that BI held a valid first lien on the Property, he also acknowledged that "there are no defenses or offsets to said mortgage, nor to the bond or note which it secures." (Exhibit J).

13. Under the terms of the Stipulation of Forbearance, monthly checks of $21,145.82, representing interest only at the rate of 8.75% per annum, were to be issued and made payable to BI. (Exhibit J at ¶ 5).

14. Paragraph 7 of the Stipulation of Forbearance states that "[a]ny forbearance and acceptance of monies by [BI] pursuant to the terms of this stipulation of forbearance shall not be deemed to discontinue the foreclosure action nor to bar [BI] from the [sic] proceeding with its foreclosure action, only in the event that [Debtor] default[s] hereunder."

15. Paragraph 8 of the Stipulation of Forbearance required that the Debtor maintain the Property and comply with all other covenants contained in the mortgage, including maintaining insurance on the Property and paying all present and future real estate taxes and water and sewer expenses when due.

16. Pursuant to a Purchase and Withdrawal Agreement, dated July 10, 2007 and executed by Solof and Neuman, individually, Solof transferred his 50% interest in the Debtor to Neuman in exchange for Neuman's personal guaranty. (Exhibit I).

17. Pursuant to the terms of the Purchase and Withdrawal Agreement, the "Parties," defined as the Seller/Solof and the Purchaser/Neuman, agreed to "release, acquit and forever discharge to the extent permitted by law" each other in connection with "any and all actions, suits, debts, claims, demands, counterclaims, demands, liabilities, damages, causes of action, judgments, costs, expenses and compensation of every kind and nature whatsoever (collectively 'Claims'), past or present, in law or in equity, whether known or unknown . . . upon or by reason of any matter, cause or thing whatsoever including, without limitation, any Claim existing or relating to the LLC and their relationship thereto as between themselves. Specifically excluded

from the foregoing Release are the terms and provisions of that certain Stipulation of Forbearance simultaneously executed herewith and the Mortgage provided for therein." (Exhibit I).

18. On or about December 6, 2007, the Debtor and Neuman, as plaintiffs, filed a summons and complaint against BI and Solof, as defendants, in the Supreme Court of the State of New York, Nassau County, seeking to recover damages. (Exhibit P). According to the docket of the action in the Supreme Court of the State of New York, there is also a motion pending filed by BI and Solof on December 18, 2008, which was filed approximately two weeks prior to the Debtor's petition being filed, seeking to dismiss the action in the state court.[3]

19. Payments were made to BI's attorney pursuant to the terms of the Stipulation of Forbearance and the assigned note and mortgage through at least June 2008. Actually, and upon review of Exhibit Q, Neuman testified that it appeared that the payments had been made through September 2008 (Tr. at 102 and Exhibit Q[4]).

20. The Debtor failed to pay pre-petition real property and school taxes to Oneida County for 2007-2008 school taxes, 2008 real property taxes and 2008-2009 school taxes.

21. The Debtor filed a voluntary petition ("Petition") pursuant to Chapter 11 of the Bankruptcy Code on December 30, 2008.

22. The Debtor has failed or otherwise refused to pay any postpetition payments to BI under the terms of the Stipulation of Forbearance or assigned note and mortgage.

23. The Debtor failed to timely pay postpetition 2009 real property taxes to Oneida County and such taxes were due and owing as of the filing of BI's motion for relief from the automatic stay on January 28, 2009.

24. According to a Broker's Price Opinion, dated January 12, 2009, the fair market value of the Property was estimated to be between $1,670,000.00 and $2,505,000.00 based on a visual

---

[3] According to the docket in the Debtor's case, no motion has been filed seeking relief from the automatic stay to continue the Supreme Court of the State of New York action. Nor has there been any motion on the Debtor's behalf seeking authorization for the appointment of an attorney to represent the Debtor in that action.

[4] Based on a review of Exhibit Q, it does not appear that a check was issued in July 2008, but payments are listed as having been made in August - October 2008 by Neuman Associates LLC., payable to BI's attorney, Peter T. Roach, Esq. *See, e.g.*, Check No. 446, dated September 5, 2008 and Check No. 460, dated August 5, 2008 of Exhibit Q.

6

inspection of the exterior of the Property (Exhibit A).

25.     BI filed a proof of claim against the Debtor in the amount of $3,380,833.00 on July 24, 2009.

In addition to the above, the Court has reviewed the Schedules and Statement of Financial Affairs filed on behalf of the Debtor. According to Schedule D, the Debtor identifies $2,946,633.00 in secured claims, including that of BI in the amount of $2,900,000.00. The balance of the secured claims listed by the Debtor is comprised of claims for city, school and county taxes and sewer charges.

Schedule E identifies $88,966.90 in priority claims, none of which are disputed. These include a claim of the New York State Attorney General of $6,000.00, a claim of the New York State Workers Compensation Board of $48,000.00,[5] a claim of the New York State Department of Taxation & Finance in the amount of $2,013.90, a claim of the Internal Revenue Service of $31,935.93 and a claim of the New York State Department of Labor in the amount of $1,017.17.

Schedule F identifies $10,738,313.56 in unsecured claims. Based on a review of Schedule F, and the proofs of claim filed in the case, unsecured creditors are summarized as follows:

| Creditor | Amount listed on Schedule F | Amount on Proof of Claim |
| --- | --- | --- |
| Levitt & Gordon | $5,000.00 | Undisputed |
| Maglock Corp. | $5,030.26.00 | $6,814.13, +interest |
| Old Town Realty[6] | $1,600,000.00 | Undisputed |
| National Grid | $110,000.00 | $101,350.54 |
| Bentley Rothchild Dev. | $8,100,000.00 | Disputed; No proof of claim |

---

[5] The New York State Workers Compensation Board filed a proof of claim on April 24, 2009, in the amount of $48,798.33.

[6] Old Town Realty is listed at the same address as both the Debtor and Neuman, namely 345 Route 17S, Upper Saddle River, New Jersey, and BI has asserted that Old Town Realty is an "insider" of the Debtor.

| | | |
|---|---|---|
| Boylan, Brown, Cade | $132,358.76 | $33,852.93 |
| Hoffinger, Stern & Ross | $785,925.60 | $80,551.70[7] |
| Menter, Rudin & Trivelpiece | Not listed | $7,511.99 |

The Court calculates that the unsecured claims are overstated by approximately $800,000.00, exclusive of the claim of Old Town Realty. Also, because Bentley Rothchild Development failed to file a timely proof of claim and was identified as holding a disputed claim, it appears that unsecured claims should be reduced by an additional $8.1 million. The Court estimates unsecured claims of $1,835,081.10, less the claim of Old Town Realty of $1,600,000[8], would total $235,081.10.

In addition, the Court has reviewed the most recent operating reports filed on behalf of the Debtor on August 11, 2009, the day after the evidentiary hearing. Debtor shows net income of negative $21,324.00 as of January 31, 2009; net income of $3,782.22 as of February 28, 2009; net income of negative $507.00 as of March 31, 2009; and net income of $6,271.44 as of April 30, 2009. The net income does not include any payments to BI on its mortgage. Neuman testified that rent rolls were up and that he anticipated income of $75,000.00 per month with all apartments (167) rented. (Tr. at 90). On cross-examination, Neuman acknowledged that the Property had never had a 100% occupancy, pointing out, however, that not all 167 apartments had ever had certificates of occupancy. (Tr. at 94). Neuman also testified that he would be willing to invest additional funds as long as the Court was willing to "give this project a chance." (Tr. at 89). In response to a question

---

[7] According to the proof of claim filed on behalf of Hoffinger Stern & Ross, LLP, while it performed services for various entities of Neuman, only $80,551.70 in services were performed in connection with the Debtor.

[8] For purposes of this discussion and these calculations, the Court makes no finding with respect to Old Town Realty and whether it is an insider of the Debtor as defined in Code § 101(31), except to note the fact that it shares an address with both the Debtor and Neuman.

8

on direct, Neuman testified that he "absolutely" had sufficient monies, either personally or through other entities under his control, and would make the funds available to support any plan of the Debtor. When asked what Debtor intended to propose in its plan regarding BI's mortgage, Neuman testified that it would depend on the outcome of the pending action in New York Supreme Court, Nassau County. (Tr. at 104).

## DISCUSSION

Section 362 of the United States Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if-
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization...

*See* 11 U.S.C. § 362(d).

> Under section 362(d), a court must relieve a party with an interest in secured property from the automatic stay provision if the debtor has no equity in the property and "such property is not necessary to an *effective reorganization*." 11 U.S.C. § 362(d) (emphasis added). Once the debtor's lack of equity in the collateral has been demonstrated, the burden shifts to the debtor to prove that the property is "necessary to an effective reorganization." *Id.*

*In re 266 Washington Assocs*, 147 B.R. 827, 829 (E.D.N.Y. 1992).

In this case, the parties appear to agree that BI's claim is undersecured. According to the Broker Price Opinion, submitted on behalf of BI, the value of the Property is estimated to be

9

between $1,670,000.00 and $2,505,000.00.  *See* Exhibit A.  According to the Debtor's schedules, BI's claim was estimated to be $2.9 million, and its proof of claim identifies $3,380,833.00 as being owed in connection with its mortgage as of the petition date.  There were also real estate taxes listed by the Debtor in Schedule D of the Petition in the amount of $46,633.00.  Based on these facts, the Court concludes that the Debtor lacks equity in the Property.

Accordingly, the Debtor has the burden of establishing that the Property is necessary to an effective reorganization.  As a single asset real estate case, there is no doubt that the Property is indispensable to the Debtor's reorganization.  However, based on the Supreme Court decision in *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988), the seminal case addressing the standard to be applied under Code § 362(d)(2)(B), the Debtor must establish that the Property "is essential for an effective reorganization *that is in prospect*.  This means, as many lower courts . . . have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* at 375-76 (emphasis added).

The courts recognize what has been referred to as a "sliding scale" in connection with the Debtor's burden of proof depending on the timing of the motion for relief from stay and whether it was made during the 120 day exclusivity period set forth in Code § 1121(c).  In this case the original date for filing Debtor's plan was April 29, 2009, which has been extended by the Court, most recently to November 12, 2009.  BI's motion was filed on January 28, 2009, approximately one month after the Petition was filed.  Under that scenario, the Debtor's burden is a lesser one requiring that it establish a realistic chance or "plausibility" for reorganization.  However, the evidentiary hearing on BI's motion was held on August 10, 2009, some three months after the original deadline for filing the Debtor's plan.  Under those circumstances, the Court believes that the Debtor's burden

10

shifts to one requiring that it establish that a successful reorganization is "probable" or likely to occur, rather than simply "plausible." *See In re Gunnison Center Apartments, L.P.*. 320 B.R. 391, 402 (Bankr. D.Colo. 2005). In the view of this Court, consideration should be given to the fact that not only did the Debtor not file a plan prior to the evidentiary hearing apparently awaiting the decision in the state court, but it also did not commence making any monthly payments to BI pursuant to Code § 362(d)(3)(B), arguably in reliance on the Court's prior extensions pursuant to Code § 362(d)(3)(A).

A review of the operating reports filed in the case raise serious concerns as to this Debtor's ability to pay not only BI's claim but also those of the real property taxing authorities, which, of course, prime BI's mortgage. Four months postpetition, the Debtor had monthly net income of $6,271.44 in April 2009, which net sum did not include a payment to BI or include the payment of any postpetition taxes. Debtor's gross income from the collection of rents was $20,399.38 in February, $22,993.00 in March and $23,785.44 in April. This is barely sufficient to pay the monthly management fees of Allphase Electric, LLC.

These facts do not support the possibility of the Debtor being able to effectively reorganize in a reasonable period of time. Debtor's projected estimates that it will generate $75,000.00 per month from rental income assumes full occupancy of all 167 apartments and rent of $450.00 per month. However, based on rental income of $23,785.44 in April 2009, the Court calculates that only approximately 53 apartments were rented at that time. As one court noted, "an effective reorganization cannot be based solely on speculation." *See In re Pegasus Agency, Inc.,* 101 F.3d 882, 887 (2d Cir. 1996), quoting *In re Kent Terminal Corp.*, 166 B.R. 555, 562 (Bankr. S.D.N.Y. 1994).

11

While Neuman testified that he was prepared to personally, or through some of his other entities, fund the operations of the Debtor, there is no evidence on the record demonstrating his financial ability to make such a commitment. Similar testimony was found lacking by the Honorable Stephen D. Gerling in *In re Garsal Realty, Inc.*, 98 B.R. 140, 156 (Bankr. N.D.N.Y. 1989). In *Garsal Realty* the debtor's principal testified that she would commit her own funds, up to $1 million, to the debtor's reorganization efforts. Judge Gerling found this insufficient "inasmuch as there is no documentary or testimonial proof substantiating her purported assets. . . . Evincing no more than pipe dreams and high hopes, the Debtor's principal's speculations totally fail to meet its burden of proof under Code § 362(g)(2) with respect to Yorkshire Manor [a sixty unit apartment complex owned by the debtor] being necessary to an effective reorganization that is in prospect." *Id.* The same can be said about the testimony offered by Neuman on behalf of the Debtor in this case.

Furthermore, in ruling on BI's motion for relief from the automatic stay pursuant to Code § 362(d)(2), the Court must consider whether there exists any legal obstacles to a plan's confirmation. *See 266 Washington*, 147 B.R. at 830 (citations omitted). The Court notes the difficulty confronting the Debtor in obtaining an affirmative vote of the claims of unsecured creditors in connection with any proposed plan. Whether one relies on the amount calculated by the Court to be $235,081.10 in unsecured claims or $274,565.49, as estimated by the Debtor (*see* Debtor's Post-Hearing Memorandum of Law, filed September 14, 2009, at 14), exclusive of BI's deficiency claim of approximately $875,833.00 based on its proof of claim and an estimated value of or the Property of $2,505,000.00 (the higher of the range set forth in Exhibit A), it is clear that

BI, at 76% of the class,[9] controls the class for acceptance purposes. Also, as BI points out, if it were to make a § 1111(b)(2) election, the Debtor's cash flow would not support payment of BI's secured claim of over $3.3 million. Thus, any plan proposed by the Debtor is patently unconfirmable. Accordingly, the Court concludes that there is no reasonable possibility of a successful reorganization within a reasonable time by the Debtor under the facts before this Court.

**CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that BI's motion seeking relief from the automatic stay is granted pursuant to Code § 362(d)(2).[10]

Dated at Utica, New York
this 26th day of October 2009

                                                           /s/ Diane Davis
                                                          DIANE DAVIS
                                                          U.S. Bankruptcy Judge

---

[9] The 76% is calculated by combining $274,565 in unsecured claims, as estimated by the Debtor, and BI's deficiency claim of $875,833, which amounts to $1,150,398, and dividing that total by $875,833.

[10] Given the conclusion of the Court, it is unnecessary that it address Code § 362(d)(1) or BI's request for the appointment of an § 1104 trustee.